

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    APR   7 2010

LORETTA G. WHYTE
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET NO. 09-317 |
| v. | * | SECTION: B |
| RUDY CABRERA | * | |
| | * | |
| | * | |
| *    *    * | | |

## F A C T U A L   B A S I S

Should this matter proceed to trial, the United States will prove beyond a reasonable doubt,

through credible testimony of agents of the Drug Enforcement Administration ("DEA"), state and

local law enforcement agencies, and the production of reliable evidence, the following facts:

On December 15, 2008, a Tangipahoa Parish Louisiana Sheriff's Office ("TPSO") agent

arrested TIMOTHY BROWN on a State of Louisiana possession of methamphetamine warrant. At

the time of BROWN's arrest, he was found to be in possession of approximately 42.5 grams of

methamphetamine. The methamphetamine was analyzed by a DEA laboratory and found to contain

methamphetamine hydrochloride and weighed 40.2 net grams.

The agent advised BROWN of his rights per the Miranda warnings. BROWN waived those

rights and agreed to answer the agent's questions. BROWN stated that the methamphetamine seized

from BROWN had been provided to him by a white male named JOHN DAIL from Baton Rouge, later identified as JOHNATHAN DAIL. BROWN said that DAIL had "fronted" (provided on consignment) him with multiple ounces of methamphetamine in the past, which BROWN had either consumed in small quantities or distributed to other persons from half-gram to multi-gram quantities.

BROWN stated that he was introduced to DAIL's source of supply, STEVEN BOZANT, for the purpose of BROWN becoming a drug courier for BOZANT, but as of yet BROWN had not transported any drugs.

During this interview, BROWN received a telephone call from DAIL. The agent provided BROWN with a recorder in order to record future telephone conversations. At approximately 9:25 p.m., BROWN received another incoming call from DAIL, which was recorded. DAIL inquired if BROWN had any methamphetamine left over and BROWN stated that he an "eight-ball" left. DAIL stated that he promised some methamphetamine to someone else and didn't have anything to give them. DAIL asked if "it had been picked through and was the same stuff" because he didn't want to provide his customers with poor quality methamphetamine.

At approximately 9:32 p.m., BROWN placed a recorded telephone call to DAIL. During this call BROWN told DAIL that, as it turned out, BROWN had no methamphetamine to give back to DAIL, but would give DAIL $300. DAIL said that would be helpful and agreed to meet BROWN.

At approximately 10:06 p.m., BROWN and DAIL met at the Texaco gas station near Hammond, Louisiana. An agent conducted surveillance of the meeting, which was recorded. During this meeting, BROWN provided DAIL with $300. During this recorded conversation, DAIL said that "he" (referring to STEVEN BOZANT) was worried the "shit" (methamphetamine) "wouldn't pass" (meaning was of poor quality) but they still have to give him (referring to STEVEN BOZANT) something, and that the girls would be back soon with "something". DAIL said he was going around

2

collecting money but it was hard to do when he didn't have anything to give them. DAIL said he had been lying to them so they would come meet him. DAIL said Jason (referring to JASON BICKFORD) was coming out like a "bandit", but still bitching like he didn't make any money and then handed DAIL $700 to get "shit".

BROWN asked DAIL if DAIL had asked (BOZANT) about BROWN "driving" and DAIL said he (referring to BOZANT) wanted to see how this worked out and he (referring to BOZANT) talked about switching to another dealer if the quality remained poor. DAIL said if he (referring to BOZANT) was going to spend that kind of money he should be getting good dope every time. DAIL said they were putting "30 G's" every week into "this shit". DAIL said he had $9,000 into it – $6,000 "fronted out" which he just collected, and $3,000 at the house. DAIL said that he used (methamphetamine) to get high, but he was "in it"mainly for the money.

After the meeting between BROWN and DAIL, an agent observed DAIL travel to a nearby neighborhood where he met with the occupant of a white Chevrolet S-10, later identified as JASON BICKFORD. During a March 3, 2009 interview of DAIL by DEA special agents, DAIL stated that he sold quarter-ounces of methamphetamine to JASON BICKFORD.

On January 30, 2009, a Confidential Source (hereafter referred to as the CS) placed a consensually recorded telephone call to STEVEN BOZANT. During the call, the CS stated that he/she wanted to purchase two ounces of methamphetamine. In response, BOZANT stated that he was not being supplied by his primary source of supply due to a dispute over a shipment of methamphetamine that BOZANT felt was substandard and that he attempted, unsuccessfully, to fix. However, BOZANT stated that he had a secondary source of supply located in New Orleans East. BOZANT agreed to complete the sale in a couple of days.

On February 3, 2009, DEA special agents established surveillance on BOZANT's residence. Agents also provided the CS with a recording device and $1,700 in government funds to purchase the methamphetamine. At approximately 10:25 a.m., the CS's vehicle arrived at BOZANT's residence. Shortly thereafter, BOZANT exited his residence, walked to the CS's vehicle, leaned inside the vehicle, and placed a quantity of methamphetamine on the CS's lap in exchange for the $1,700. Later, the CS left the area in his/her vehicle and met with DEA agents, who retrieved the methamphetamine, which was sent to a DEA laboratory and confirmed to be methamphetamine and which weight 28.2 grams.

On the afternoon of February 3, 2009, agents from the TPSO and Hammond Police Department conducted surveillance of a CS meet with DAIL in Hammond, Louisiana for the purpose of the CS picking up DAIL in Hammond, Louisiana, and driving him to New Orleans so DAIL could purchase methamphetamine for the CS and others. The CS was provided with a recording device and issued $800 in United States Currency for the purpose of purchasing one-half ounce of methamphetamine from DAIL.

Agents conducted surveillance of the CS and DAIL as they traveled from DAIL's residence to East New Orleans. At approximately 6:22 p.m., DEA special agents established surveillance at the Home Depot store located at 12300 Interstate-10 Service Road in New Orleans. Agents learned of this location from the transmitted conversation between the CS and DAIL as they traveled into the New Orleans area.

At approximately 6:32 p.m., special agents observed a black male driving a white Nissan truck enter the parking lot and park near the CS's vehicle. The truck was registered to BRIAN CLARK. Agents observed DAIL exit the CS's vehicle and walk to the white Nissan truck, speak to the driver, and return to the CS's vehicle. Agents then observed the Nissan depart the lot

4

followed by the CS's vehicle. Agents then observed both vehicles travel from the Home Depot parking lot to the Cajun Seafood Restaurant located at 5971 Bullard Avenue in New Orleans. At approximately 6:37 p.m., agents observed the black male driving the Nissan, later identified at BRIAN CLARK, the CS, and DAIL, exit their respective vehicles, and enter the restaurant.

At approximately 7:15 p.m., DEA special agents observed CLARK, the CS, and DAIL, exit the restaurant and enter the CS's vehicle were they sat for a short time. Agents then observed CLARK exit the CS's vehicle and get back into the white Nissan truck after which both vehicles exited the restaurant's parking lot and traveled north on Bullard Avenue towards I-10.

Agents maintained surveillance of the CS's vehicle from the seafood restaurant back to Hammond. Later, special agents met with the CS and secured the suspected methamphetamine purchased from CLARK. This was later analyzed by DEA Laboratory and the analysis indicated that it consisted of methamphetamine hydrochloride and weighed 13.0 net grams.

Agents then listened to the recorded conversation between the CS and DAIL and between the CS, DAIL, and CLARK. The following is a summary of these conversations. The CS could be heard counting out $800 for DAIL. DAIL said, "We're going to get an ounce (methamphetamine) right now and maybe a little bit more." On multiple occasions, DAIL complained about losing money to Steve (referring to BOZANT). Further into the recorded conversation, DAIL said that he had been talking to **RUDY CABRERA** and that they could get it (referring to methamphetamine) from **CABRERA** at any time and DAIL wanted to pay cash and not get it on a "front". DAIL said that they would take a couple thousand dollars and go get it. DAIL said that **CABRERA** was "sending dope with this dude right here" (referring to CLARK) next time on Friday. DAIL said he could get "it" (methamphetamine) from **CABRERA** for $900 an ounce if DAIL drove and picked it up from **CABRERA**. DAIL said he would not pay $1,000 for two different "chicks" to drive "it"

5

back and instead DAIL was going to drive his own "shit" back and was not scared to do so.  DAIL said if they caught him with five or twenty pounds, it would all be the same charge and they could bust him here or bust him there and if you're scared you need to go to church and DAIL knew what he was getting into.   DAIL said that BOZANT has gotten "nine drops" (shipments of methamphetamine) from **CABRERA**.

On the morning of February 16, 2009, the CS was contacted by DAIL to rent a car for DAIL in order for DAIL to travel to Dallas, Texas, and meet with **CABRERA** to purchase methamphetamine.  At approximately 12:45 p.m., the CS, under the direction of agents, rented a four door red Ford Focus from Budget Rental in Hammond, Louisiana.  At approximately 1:20 p.m., the CS drove the rental car to DAIL's residence.  From there, DAIL and JAMES "JAMIE" LEE, leaving the CS behind, traveled onto I-12 westbound from Highway 51 in Hammond.

Special agents proceeded to maintain surveillance of the rental car from Hammond, Louisiana, to Dallas, Texas.  At approximately 8:30 p.m., special agents observed the rental car park at the Palace Suites Hotel located at 3422 Samuell Boulevard in Dallas, at which time DAIL and LEE checked into room number 108.

At approximately 8:56 p.m., agents observed a black 1995 Ford pick-up truck arrive and park in the hotel parking lot.  DAIL then entered the passenger side of the black Ford truck. Approximately eight to ten minutes later, DAIL exited the truck and went inside his hotel room and then after about one minute, DAIL returned to the truck and spoke with the driver of the truck for approximately one to two minutes.  At approximately 9:10 p.m., DAIL walked away from the truck at which time the truck departed and DAIL re-entered his room.

Agents followed the black Ford truck from the hotel, at which time surveillance was lost. Approximately five to ten minutes after losing sight of the truck, agents observed the truck in front

of Complete Auto Service at 1120 South Industrial Avenue in Dallas. According to Dallas County tax records, Complete Auto Service is owned by **RUDY CABRERA**.

On February 17, 2009, at approximately 8:15 a.m., special agents observed LEE and DAIL standing in front of their room. About thirty minutes later, DAIL and LEE departed the hotel. At approximately 9:00 a.m., the car departed the Dallas area. Special agents maintained surveillance on the car until it returned to Hammond, Louisiana.

On the afternoon of February 17, 2009, the CS was contacted by DAIL and requested that the CS meet DAIL at Budget Rental so the CS could turn in the CS's rental car that was in DAIL's possession that he had used to travel to Dallas with LEE. At approximately 4:57 p.m., DEA special agents met with the CS and provided him/her with a recording device. The following conversation was recorded. DAIL said that he checked into the hotel room with LEE in Dallas and then met with **CABRERA** in **CABRERA**'s truck at which time the two of them talked about the "Steve" situation. DAIL gave **CABRERA** the money and **CABRERA** agreed to supply DAIL with an amount of methamphetamine for that amount of money and then "match" (provide on consignment) an equal amount. In addition, DAIL said **CABRERA** left the hotel and was to return in an hour but never returned. DAIL text messaged **CABRERA** a total of five times to see why he had not returned and **CABRERA** replied that he was in the process of getting the dope. However, after 11:30 p.m., **CABRERA** stopped responding and never returned.

On February 19, 2009, the CS informed a DEA special agent that BOZANT wanted to meet with the CS and JAMES LEE to discuss the situation regarding LEE and DAIL being robbed of money by **CABRERA** in Dallas, Texas. On the afternoon of February 19, 2009, DEA special agents met with the CS in Hammond, Louisiana, and provided the CS with a recording device. The CS then departed the meet location en-route to pick up LEE.

7

At approximately 5:00 p.m., the CS contacted BOZANT by cell phone at which time BOZANT requested the CS meet him at Zemurray Park in Hammond. At approximately 5:08 p.m., DEA special agents observed the CS vehicle enter the park, and at approximately 5:09 p.m., observed the CS vehicle park next to a PT Cruiser. The CS and LEE were riding together. At approximately 5:10 p.m., agents observed the CS, LEE, STEVEN BOZANT and Brandon Bozant standing near a pond located in the south west portion of the park.

Later that evening, agents retrieved the recording device. Agents then listened to the recorded conversation. LEE stated that he showed "the bitch" (referring to DAIL) a bullet in a forty caliber pistol with two clips to let DAIL know LEE was serious. LEE said if he hadn't been going to church and trying to be good, he would have killed DAIL. BOZANT responded by saying he quit dealing with DAIL because DAIL got him for six or seven ounces (of methamphetamine). LEE told BOZANT that DAIL told him things about BOZANT such as BOZANT living at the first house on the right of Louisiana Street and that BOZANT had a safe in his house. In response, BOZANT said he had three grown men in the house and they all slept with shotguns under their beds. In addition, BOZANT said that when he made money, everybody made money and he met him (referring to **CABRERA**) through a friend. BOZANT said he always brought this dude his money and dealt with him for months. BOZANT stated he would have thirty or forty grand of his money and would get in a car and give him his thirty grand. LEE asked if Rudy (referring to **CABRERA**) had his money. BOZANT responded that **CABRERA** "got Johnathan" (meaning **CABRERA** stole money from DAIL) and didn't know LEE was there (in Dallas). ~~BOZANT said he must have brought him (referring to **CABRERA**) $800,000 back to Texas in the last month. BOZANT also said he was making twenty grand a week and had spent a large amount of money.~~ BOZANT said he makes

8

**CABRERA** front to him and that keeps the relationship real so they wouldn't fuck each other over because **CABRERA** needs the money and BOZANT needs the dope.

On March 12, 2009, DEA agents interviewed JONATHAN DAIL at the Tri-Parish Narcotics Office in Robert, Louisiana. Agents re-advised DAIL of his rights per the Miranda Warning before the interview began. DAIL voluntarily agreed to answer agent's questions.

DAIL said he started buying methamphetamine from BOZANT at the beginning of November 2008. DAIL met BOZANT through another individual from Baton Rouge, Louisiana, a customer of BOZANT who distributed four to five ounces of methamphetamine per week. DAIL had been purchasing smaller amounts of methamphetamine from that other individual, but then started dealing with BOZANT and BOZANT "fronted" him at least one ounce per week for two weeks. BOZANT charged him $1,600 per ounce.

DAIL stated that just after Thanksgiving of 2008, DAIL progressed to purchasing between four to six ounces of methamphetamine from BOZANT throughout the next three weeks. BOZANT charged DAIL $4,800 per four ounces. DAIL estimated he purchased at least a total of one pound of methamphetamine from Steven BOZANT from Thanksgiving through Christmas Day of 2008. DAIL stated that on December 15, 2008, DAIL observed BOZANT in possession of multiple heat sealed air tight bags that each contained twelve ounces of methamphetamine.

DAIL stated that in December of 2008, BOZANT instructed him to drive to Baton Rouge and pick up seven and a half ounces of methamphetamine that was of poor quality in order for DAIL to "fix" the methamphetamine. DAIL picked up the methamphetamine from another individual in an unknown sub-division in Baton Rouge and transported the drugs to a room at the Marriott Hotel located on Siegen Lane in Baton Rouge. DAIL paid JASON BICKFORD and another individual to "fix" the methamphetamine by adding a "cutting" substance DAIL called "MSN". DAIL said he

left the hotel room and when he came back, BICKFORD and the other individual had the bathtub full of methamphetamine. Ultimately, the methamphetamine looked like wet snow. This was ultimately sent back to **CABRERA**.

BOZANT contacted DAIL the next day and said **CABRERA** was mad about the returned methamphetamine because it had been altered and did not look right. BOZANT blamed DAIL for ruining the drugs and stated that DAIL was responsible for paying for them. This methamphetamine had been "fronted" to BOZANT by **CABRERA**. DAIL said he gave BOZANT $4,500 to get more methamphetamine from **CABRERA** but didn't know if BOZANT gave the money to **CABRERA** or not.



DAIL stated that because of this controversy over the ruined methamphetamine, **CABRERA** traveled to Hammond, Louisiana, and stole BOZANT's PT Cruiser that belonged to another individual, which was later recovered from **CABRERA**'s body shop in Dallas.

DAIL stated he purchased one ounce of methamphetamine for $1,600 on two occasions in February of 2009 from BRIAN CLARK. The first time DAIL met CLARK outside of a house located near Bullard Avenue in New Orleans, and the second time DAIL met CLARK at a seafood restaurant on Bullard Avenue. DAIL stated that he and CLARK discussed BOZANT owing him money and CLARK promised to talk to **CABRERA** about letting DAIL purchase methamphetamine directly from **CABRERA**.

On March 19, 2009, DEA special agents interviewed STEVEN BOZANT after he was read and waived his Miranda rights. BOZANT stated that he met **RUDY CABRERA** around June or July 2008. Shorting after meeting **CABRERA**, BOZANT stated he began distributing methamphetamine provided by **CABRERA**. BOZANT stated that during the four to five month

period that he was dealing with **CABRERA**, he was distributing one to two pounds of methamphetamine every four to seven days. BOZANT stated he paid **CABRERA** approximately $15,000 per pound of methamphetamine. ~~BOZANT also stated that he sent **CABRERA** approximately $ ██████ in cash proceeds over the time frame he was dealing with **CABRERA**~~.

On April 9, 2009, DEA special agents interviewed JASON BICKFORD after he was read and waived his Miranda rights. BICKFORD stated that in approximately December of 2008, DAIL contacted him and requested BICKFORD help DAIL "cut" some dope because BICKFORD was experienced in the production of methamphetamine. DAIL drove BICKFORD to a hotel near Siegen Lane in Baton Rouge, Louisiana. DAIL and BICKFORD entered DAIL's hotel room where BICKFORD observed approximately 10 ounces of methamphetamine contained in a zip lock bag. BICKFORD observed an unidentified male in the room BICKFORD described as an older thin white male. This unidentified male placed the methamphetamine into a Pyrex bowl and attempted to heat the methamphetamine on a hot plate (in the bathroom) until it turned into a liquid. The unidentified male then poured a "cutting" agent BICKFORD called "MSM" into the liquid at which time the "MSM" melted into the liquid. The methamphetamine with "MSM" then hardened.

In addition, BICKFORD stated that he began purchasing eighth ounces of methamphetamine from DAIL in approximately November 2008. BICKFORD purchased eighth ounces of methamphetamine two to three times a week for $250 per "eight-ball" and sold the methamphetamine to customers in the Hammond area. According to BICKFORD, BICKFORD both purchased methamphetamine and was "fronted" methamphetamine from DAIL. Moreover, on December 15, 2008, BICKFORD met with DAIL in front of Heather Windecker's house in Hammond, Louisiana and gave DAIL $200 as payment for an "eight-ball" that DAIL provided BICKFORD earlier and BICKFORD owed him an additional $65.

On April 15, 2009, a CS placed a consensually recorded telephone call to **CABRERA**.  The CS asked **CABRERA** to "work something for me brother" (referring to the CS needing **CABRERA** to supply him with methamphetamine to sell).  They agreed to talk again when **CABRERA** was ready to sell the CS more methamphetamine.

On April 29, 2009, at approximately 6:37 p.m., the CS received an incoming call from **CABRERA**, which was consensually recorded by the CS, during which **CABRERA** told the CS to travel to Dallas, Texas, to complete the methamphetamine sale.  The CS stated he would be there in a few days.

On May 1, 2009, DEA agents in Dallas provided the CS with a recording device and $900 to complete the purchase of methamphetamine from **CABRERA**.  At approximately 9:30 a.m., surveillance was established on **CABRERA**'s body shop located in Dallas.   Shortly thereafter, the CS was observed arriving at that location.  The CS exited his/her vehicle, met **CABRERA**, and then walked with **CABRERA** into the body shop.

At approximately 10:00 a.m., **CABRERA** and the CS decided to leave the body shop to have breakfast at a restaurant nearby.  At approximately 10:45 a.m., they returned to the body shop.  Once there, the CS drove his/her vehicle into the body shop.  Once inside, **CABRERA** hid eight ounces of methamphetamine in the bumper of the CS's vehicle in exchange for the $800.

At approximately 10:00 a.m., the CS departed the body shop and drove to met DEA agents.  At that time, DEA agents recovered the methamphetamine, which was tested by a DEA laboratory and confirmed to be methamphetamine.

On May 7, 2009, Dallas Police Department officers and DEA special agents executed a state search warrant for **CABRERA**'s body shop located at 1120 South Industrial Blvd., Dallas, Texas.

Inside of an office located within the body shop, agents found a clear plastic bag containing approximately 62.1 grams of marijuana, a Tanita scale, a Mossburg 12 gauge shotgun, serial number 600AT, loaded with one slug round in the chamber and five buck shot rounds secured in the side mounted magazine holder, one 22 caliber Glenfield rifle, Model 60, serial number 20434209, and one .25 automatic Sundance pistol, Model A-23, serial number 034717.

Also on May 7, 2009, DEA special agents interviewed **RUDY CABRERA** after he was read and waived his Miranda rights. During that interview, **CABRERA** stated that he has regularly purchased one and one-half pound quantities of methamphetamine from his source of supply over the past ~~eight to nine months~~ six months on a monthly or bi-monthly basis. In addition, **CABRERA** stated that he supplied two to three ounces of methamphetamine to an individual in New Orleans, Louisiana, at least every other month. Also, **CABRERA** admitted that he sold, gave, and/or fronted four and one-half ounces of methamphetamine to STEVEN BOZANT about seven or eight days ago.

On or about November 13, 1987, in eighty-seventh Judicial District Court, County of Freestone, Texas, under case number 87-042-CR, the defendant, **RUDY CABRERA**, pled guilty to the charge of possession of a controlled substance, to wit: heroin, in violation of Texas state law. He was then sentenced to five years imprisonment in the Texas Department of Corrections. This conviction is now final.

Based on a review of the evidence, the government determined, and the government and defendant stipulate and agree to the fact, that it is reasonably foreseeable that **RUDY CABRERA**'s involvement in the above described conspiracy involved only 500 grams of methamphetamine.


READ AND APPROVED:

_____          4/7/10
SEAN TOOMEY                               _____
Assistant United States Attorney          DATE

_____          4-7-10
DAN ROBIN                                 _____
Counsel for Defendant Rudy Cabrera        DATE

_____          4-7-10
RUDY CABRERA                              _____
Defendant                                 DATE

14